IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

SHAWN M. SMITH,

          Plaintiff,

v.                                        CIVIL ACTION NO. 3:10-1154

KANAWHA RIVER TERMINALS LLC and
KANAWHA RIVER TERMINALS, INC.,

          Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court is Defendant Kanawha River Terminals, LLC, and Defendant Kanawha River Terminals, Inc.'s Motion for Summary Judgment (ECF No. 34). For the reasons set forth below, the motion is **DENIED**.

**I. Introduction**

Kanawha River Terminals (KRT) is in the business of transloading coal at four different facilities. Transloading involves loading, unloading, and blending coal from trains and barges. The plaintiff worked on and off in various positions for KRT beginning in July 2004. About three weeks prior to the December 1, 2007 accident that gives rise to this suit, the plaintiff was reassigned to transloading at KRT's Ceredo facility. None of the positions held by the plaintiff prior to this reassignment required him to work on a barge, boat, or other floating equipment.

Coal barges are unloaded through the use of a transloader barge. The barge is moored in the river and mounted with an excavator and a large hopper. The excavator boom is capable of swivelling, but the excavator itself does not move on the transloader barge. The excavator is used to unload coal from customer barges that moor along side the transloader barge. The excavator

transfers coal from the barges into the hopper, which funnels the coal onto a conveyor belt for transport into the plant for further processing. While the excavator unloads the coal barge, a dockhand monitors the lines securing the coal barge to the transloader, cleans up any spills, or goes to the maintenance shack. Once the excavator operator has unloaded as much coal as possible from the barge with the excavator bucket, the excavator operator lowers a Bobcat into the coal barge which the dockhand uses to gather the remaining coal to be unloaded. On December 1, 2007, the plaintiff was working on the transloader barge as an excavator operator. After unloading as much coal as possible from the stern of a coal barge, he stepped out of excavator cabin and onto the platform in order to peer down into the stern of the coal barge to determine whether he had reached the bottom. He has no recollection of what happened next, but recalls being pulled from the river by his supervisor. It is his understanding that he fell from the platform, landed on the deck of the transloader barge, and rolled into the river.

The plaintiff is suing KRT under the Jones Act and general maritime law for damages arising from his injuries. Pending before the Court is the Defendant's Motion for Summary Judgment (ECF No. 34). The Court is asked to decide whether, as a matter of law, the plaintiff was a "seaman" for purposes of the Jones Act and general maritime law.

## II. Discussion

The Jones Act provides that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of a trial by jury, against the employer." 46 U.S.C. § 30104. The Jones Act does not define "seaman" and the Supreme Court has concluded that "Congress intended the term to have its established meaning under the general maritime law at the

time the Jones Act was enacted." *Chandris v. Latsis*, 515 U.S. 347, 355 (1995). In order to establish seaman status, the plaintiff has the burden of proving:

1. He contributed to the function of the vessel or to the accomplishment of its mission; and
2. he had a connection to a vessel in navigation (or to an identifiable group of such vessels) that was substantial in terms of both its duration and its nature.

*Chandris v. Latsis*, 515 U.S. 347, 368 (1995). The plaintiff can potentially qualify as a seaman under the Jones Act with regard to either (1) the customer barges that KRT services; or (2) the transloader barge on which he worked. As explained below, the plaintiff has failed to show that the customer barges are "an identifiable group" of vessels to which the plaintiff can achieve seaman status. *Chandris*, 515 U.S. at 368. The transloader barge, however, is a vessel within the meaning of the Jones Act and general maritime law. The plaintiff's relationship to the transloader is sufficient to state a claim under the Jones Act.

**A.    The Customer Barges**

In *Chandris*, the Supreme Court recognized that a seaman can establish his status with respect to "an identifiable group of vessels." *Chandris*, 515 U.S. at 368. The *Chandris* Court discussed favorably and at length the "fleet doctrine" developed by the Fifth Circuit Court of Appeals, which has a substantial Jones Act caseload. That doctrine generally requires a plaintiff relying on the group theory to show that the group of vessels has a common ownership or control. These cases require the group of vessels to be part of a common "fleet" defined as "an identifiable group of vessels acting together or under one control. . . [not] any group of vessels an employee happens to work aboard." *Barrett v. Chevron, U.S.A., Inc.*, 781 F.2d 1067, 1074 (5th Cir. 1986). Fleet doctrine has developed in order to ensure that "the fundamental distinction between members

of a crew and transitory maritime workers such as longshoremen is [not] totally obliterated." *Id*. at 1074.

Defendants also point out that, even if the customer barges are an identifiable fleet, the plaintiff will have great difficulty in proving that his connection with those barges is of a sufficient nature and duration to qualify him as a seaman. The Supreme Court has cited approvingly the Fifth Circuit's rule of thumb that a worker must spend thirty percent of his time on a vessel (or group of vessels) in order to qualify as a seaman. *Chandris*, 515 U.S. at 366. With regard to fleet doctrine, the Fifth Circuit has said that "when a group of vessels is at issue, a worker . . . must show that at least thirty percent of his time was spent on vessels, every one of which was under his defendant-employer's common ownership or control." *Roberts v. Cardinal Services, Inc.*, 266 F.3d 368, 375-76 (5th Cir. 2001).

The plaintiff has not alleged that the coal barges, owned by KRT's customers and under KRT's limited control for purposes of loading and unloading, constitute an identifiable fleet, nor does the relevant case law support a finding that his connection with the customer barges is sufficient to qualify him as a seaman. Indeed, the plaintiff appears not to challenge KRT on this ground and his responsive memorandum focuses entirely on the vessel status of the transloader barge, discussed below. For these reasons, the Court finds that the customer barges were not an identifiable fleet and that, even if they were, the plaintiff's connection with the barges was insufficient to qualify him as a seaman.

**B.     The Transloader Barge**

      **1.  The Transloader is a Vessel**

As a matter of maritime law, the Supreme Court has recognized that "the Jones Act and the [Longshore and Harbor Workers' Compensation Act] are complementary regimes that work in tandem: The Jones Act provides tort remedies to *sea*-based maritime workers, while the LHWCA provides workers' compensation to *land*-based maritime employees." *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 488 (2005). For this reason, a "vessel" for Jones Act purposes is defined by reference to the exclusion in the LHWCA. The Supreme Court has recognized the odd result that "the key requirement for Jones Act coverage now appears in another statute." *Chandris*, 515 U.S. at 356. A "vessel" for these purposes is defined to include "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." *Stewart v. Dutra Constr. Co.*, 543 U.S. at 489 (holding that 1 U.S.C. § 3 defines "vessel" for LHWCA purposes and construing that section consistent with general maritime law).

The *Stewart* Court declined to narrow this definition but reaffirmed the general distinction in maritime law between "watercraft temporarily stationed in a particular location and those permanently affixed to shore or resting on the ocean floor." *Id*. at 494-95. The Court emphasized this distinction, stating, "[s]imply put, a watercraft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored or otherwise rendered practically incapable of transportation or movement." *Id*. at 495. Despite the seemingly broad and inclusive language of 1 U.S.C. § 3, the Court recognized that "structures may lose their character as vessels if they have been withdrawn from the water for extended periods of time," and directed that "the question remains in all cases whether the watercraft's use 'as a means of transportation on water' is a practical possibility or merely a theoretical one." *Id.* at 496. The Court recognized that the status of a watercraft can be a jury question when there are factual disputes. *Id*. In this case, the

-5-

parties do not dispute any facts about the position, mooring, anchoring, or other circumstances of the transloader. The sole disagreement is as to whether, at the time of the accident, use of the transloader barge as a means of transportation remained a practical rather than a theoretical possibility. As such, summary judgment is appropriate. A review of Jones Act cases and their relevant facts aids the Court in reaching the conclusion that the transloader barge was still a vessel at the time of the accident that gives rise to this suit.

In *Brunch v. Canton Marine Towing, Co., Inc.*, 419 F.3d 868 (8th Cir. 2005), the Eighth Circuit held that a cleaning barge moored in the Mississippi River was a vessel for Jones Act purposes. As the defendant points out, the barge in that case was accessed by means of a ferry, was moored out in the river, and was moved to the Illinois side of the river during the plaintiff's tenure. *Id.* Faced with a similar issue in *Board of Commissioners v. M/V Belle of Orleans*, 535 F.3d 1299 (11th Cir. 2008), the Eleventh Circuit held that a riverboat casino which had been moored to the shore with steel cables and received utility lines from land was nonetheless still a vessel. *Id.* at 1307. There are two Fourth Circuit cases from 1952 which merit discussion. While they predate the recent Supreme Court cases discussed above, they have not been overruled and apply the same general maritime law applied by the Supreme Court. The first, *Summerlin v. Massman Const. Co.*, 199 F.2d 715 (4th Cir. 1952), involved a plaintiff employed as a fireman on a derrick "which was anchored in the river and was engaged in pouring concrete into certain forms incident to the building of a bridge. . . ." *Id.* at 716. The Fourth Circuit held that the plaintiff was a seaman and that the derrick was a vessel under the Jones Act despite the fact that the derrick had no sleeping quarters, no means of self propulsion, and was moved only occasionally for purposes of bridge construction.

*Id.* at 716. In its holding, the *Summerlin* court made explicit reference the second case, *Jeffrey v. Henderson Brothers*, 193 F.2d 589 (4th Cir. 1952), decided the same year.

Although neither party cites *Jeffrey*, the case strongly supports the Court's conclusion that the transloader was a vessel at the time of the incident. The watercraft at issue in *Jeffrey*, Tipple Boat No. 2, was a steel barge furnished with machinery and equipment for cleaning and screening coal. *Id.* at 590. Tipple No. 2 was equipped with a crane for loading coal to be cleaned and offloading coal after the cleaning process. *Id.* The barge had no living quarters, no means of self propulsion, and was accessed by a gangplank. *Id.* at 591. The coal cleaning operations were initially powered by an onboard steam engine which was eventually replaced by electricity supplied by a cable that ran from an onshore utility pole. *Id.* The barge began its life cleaning coal dredged from the Ohio River near Moundsville, West Virginia. In 1947, Tipple No. 2 was moved to the Monongahela River in Morgantown, West Virginia, where it was engaged in cleaning coal from the riverbank and depositing the cleaned coal onto barges, an enterprise nearly identical to the case at bar. Tipple No. 2 had been engaged in this new enterprise for six months when the suit for wages arose. The case involved whether the barge workers were entitled to a maritime lien for their wages when the barge went bankrupt, and the existence of a lien turned on whether or not the barge had been removed from navigation when it was engaged at Morgantown. The defendant argued that the barge had been withdrawn from navigation by being "securely fastened to the land so as to form practically a part thereof" and that the workers were "not seamen but workers in a machine shop engaged in the performance of the same work as if the cleaning machinery had been set up on land." *Id.* at 591. The Fourth Circuit held that the barge was still a vessel and had not been withdrawn from

navigation by being secured to the riverbank. *Id.* ("We do not think that the evidence shows that the boat was withdrawn from navigation during the operation at Morgantown.").

In this case, the transloader barge had no living quarters, no means of self propulsion, and was accessed by a steel framed walkway. Its operations were powered by electricity supplied via an onshore power cable, and it had been moored for eleven months at the time of the incident.

There are distinctions between this case and *Jeffrey* which bear mentioning. First, Tipple No. 2 moved slightly "by loosening the lines as the work required." *Id*. at 591. The transloader did not move and utilized a system of conveyors. This fact is relevant but cannot be dispositive, as *Stewart* makes clear that the inquiry is focused not on actual movements but rather on "whether the watercraft's use 'as a means of transportation' is a practical possibility rather or merely a theoretical one." *Stewart*, 543 U.S. at 496. Second, the transloader barge has a hopper which funnels coal onto a conveyor belt integrated with KRT's land-based facilities. This integration with KRT's land-based operations is significant but is ultimately insufficient for the Court to find that the barge was removed from navigation. The parties do not dispute that the barge is floating, so that it has not been anchored in the riverbed or had its hull pierced in any way that would make it unseaworthy. Additionally, eleven months is a relatively brief period, and the barge could be removed without great difficulty were it necessary for maintenance of the watercraft, the hopper, the excavator, or for some other business purpose. Focusing its inquiry on the capability of the transloader for transportation, the Court concludes that, at the time of the accident, future use of the transloader barge in transportation was a practical, and not merely theoretical, possibility.

**2. Plaintiff's Connection with the Transloader was Substantial in Duration and Nature**

In order to state a claim under the Jones Act, the plaintiff must also establish that his connection to the transloader barge "was substantial in terms of both its duration and its nature." *Chandris*, 515 U.S. at 368. While recognizing that occasional departures would be justified, the *Chandris* Court generally approved of a thirty percent rule of thumb for the durational requirement, holding that "[a] worker who spends less than about 30 percent of his time in service of a vessel in navigation should not qualify as a seaman under the Jones Act." *Id*. at 371. After the plaintiff was reassigned to the transloader, virtually all of his working hours were in service of the barge. He has unquestionably satisfied the durational requirement of the *Chandris* test, leaving only the question of the nature of his connection to the transloader.

Two years after *Chandris*, in *Harbor Tug and Barge Co. v. Papai*, 520 U.S. 548 (1997), the Supreme Court explained, "[f]or the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee's connection to the vessel must concentrate on whether the employee's duties take him to sea." *Id*. at 555. The Supreme Court also reaffirmed that part of its holding in *Chandris* that declared:

> The fundamental purpose of th[e] substantial connection requirement is to give full effect to the remedial scheme created by Congress and to separate the sea-based maritime employees who are entitled to Jones Act protection from those land-based workers who have only a transitory or sporadic connection with a vessel in navigation, and therefore whose employment does not regularly expose them to the perils of the sea.

*Id*. (*citing Chandris*, 515 U.S. at 368). This Court finds particularly instructive the Fifth Circuit's application of *Papai* in a similar context. *See In Re: Endeavor Marine*, 234 F.3d 287 (5th Cir. 2000). First, the Court agrees with the Fifth Circuit that, "when read in context, the 'going to the sea' passage in *Harbor Tug* is a shorthand way of saying that the employee's

connection to the vessel regularly exposes him to the perils of the sea," and rejects the notion that the Supreme Court meant to require that a plaintiff's job duties literally take him to sea. *Id*. at 291. The district court in *Endeavor* had dismissed the claims of a crane operator whose work "brought him aboard the barge only after the vessel was moored or in the process of mooring." *Id*. at 291. After examining the record and considering the plaintiff's entire employment-related connection to the barge, the Fifth Circuit concluded, as a matter of law, that the plaintiff was a Jones Act seaman. This opinion was based on the court's finding that the plaintiff was permanently assigned to the barge, that his "primary responsibility was to operate the cranes on board a vessel whose sole purpose is to load and unload cargo vessels," and that "in the course of his employment, [the plaintiff] was regularly exposed to the perils of the sea." *Id*. at 292. When the plaintiff was assigned to transloading, his reassignment was permanent. His primary responsibility was the unloading of coal barges, either as dockhand or excavator operator. Additionally, by being exposed to the elements, adjusting the lines on customer barges, operating a Bobcat on customer barges, and generally tending to the operations of the transloader barge, he was regularly exposed to the perils of the sea.

KRT urges the Court to adopt the position taken in *Lara v. Arctic King Ltd.*, 178 F. Supp.2d 1178 (W.D. Wash. 2001) and find that the nature of the plaintiff's connection with the ship was insufficient to qualify him as a seaman. The Court finds *Lara* unpersuasive. The plaintiff in *Lara* worked as a day laborer to perform repairs on a fishing vessel while it was docked. *Id*. The plaintiff never engaged in any fishing or processing activities, nor was he paid as a member of the crew, though he took the laborer position in hopes of earning a place among the crew. *Id*. In this case, the excavator operator and the dockhand, both positions held by the

plaintiff, were the only people working on the transloader. They both worked at unloading coal, the sole purpose for which the barge was moored at KRT's Ceredo facility. The Court additionally finds *Jeffrey v. Henderson Brothers*, 193 F.2d 589 (4th Cir. 1952) instructive. Though that case predates this one by sixty years, the Fourth Circuit very nearly described this case when they noted the following:

> By far the greater part of the work of the men was done in cleaning the coal, and maritime activity was reduced to a minimum, but it was still necessary at Morgantown to move the boat along the shore from time to time, to keep it securely in place by the use of lines and spuds, to direct the placing of the barges and the transfer of the coal that had been cleaned on the Tipple Boat.

*Id*. at 591. The plaintiff performed the duties of both excavator operator and dockhand, and the work of the dockhand is arguably more maritime in nature than the work performed by the plaintiffs in *Jeffrey*. For example, it was the job of the dockhand to keep the customer barges secured and to adjust those lines if necessary, while the excavator had the task of directing the transfer of coal from the customer barges to the transloader. As is evident from their job duties and the nature of the plaintiff's injuries, those working on the transloader barge were regularly exposed to the perils of the sea.

## IV. Conclusion

For the reasons set forth above, the Defendants' motion is **DENIED**. The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER: November 4, 2011

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE

-11-